## MEMORANDUM DECISION

Pursuant to Ind. Appellate Rule 65(D), this Memorandum Decision shall not be regarded as precedent or cited before any court except for the purpose of establishing the defense of res judicata, collateral estoppel, or the law of the case.



**FILED**

Dec 29 2017, 10:19 am

**CLERK**
Indiana Supreme Court
Court of Appeals
and Tax Court

ATTORNEY FOR APPELLANT

Kimberly A. Jackson
Indianapolis, Indiana

ATTORNEYS FOR APPELLEE

Curtis T. Hill, Jr.
Attorney General of Indiana

Robert J. Henke
Katherine A. Cornelius
Deputy Attorneys General
Indianapolis, Indiana

# IN THE
# COURT OF APPEALS OF INDIANA

In the Matter of the Termination of the Parent-Child Relationship of A.L., Mother, and Al.L., Ar.L., and K.M.L., Minor Children,

A.L.,

*Appellant-Respondent,*

v.

Indiana Department of Child Services,

*Appellee-Petitioner.*

December 29, 2017

Court of Appeals Case No.
21A04-1705-JT-1126

Appeal from the
Fayette Circuit Court

The Honorable
Daniel L. Pflum, Senior Judge

Trial Court Cause Nos.
21C01-1606-JT-202
21C01-1606-JT-203
21C01-1606-JT-204

**Kirsch, Judge.**

[1] A.L. ("Mother") appeals the juvenile court's order terminating her parental rights to her three minor children. Mother raises one issue on appeal that we restate as whether the juvenile court's judgment terminating her parental rights to the three children was clearly erroneous.[1]

[2] We affirm.

## Facts and Procedural History

[3] Mother and R.L. ("Father") are the parents of three minor children, Al.L, born in 2005, Ar.L., born in 2007, and K.M.L., born in 2009 (collectively, "the Children"). In March 2015, the Children were residing with Mother and her boyfriend. On or about March 24, 2015, Indiana Department of Child Services ("DCS") received a report that Mother was using illegal drugs in the home. Upon investigation, a DCS family caseworker observed sores and scars on Mother's arms and face that appeared indicative of methamphetamine use; Mother and her boyfriend refused to consent to drug screens. In April 2015, Mother submitted to a drug screen under court order, and she tested positive for oxycodone, for which she did not have a valid prescription.

---

[1] The juvenile court also terminated the parental rights of the Children's father, R.L., but he does not participate in this appeal.

[4]	On May 20, 2015, DCS filed a child in need of services ("CHINS") petition for each of the Children, later amended in June 2015, alleging: one of the children reported finding a syringe in the back of Mother's vehicle; Mother and her boyfriend could not adequately supervise the Children due to substance abuse; Mother "sells half of her food stamps"; and Mother and her boyfriend engaged in domestic violence in the presence of the Children. *State's Exs.* 1, 5, 10, 14, 19, 23. Mother failed to appear at the May 27, 2015 initial hearing, but she appeared at a June 17, 2015 pretrial hearing, and the juvenile court appointed separate counsel for each parent and ordered Mother and Father to provide drug screens immediately following the hearing. On or near June 24, 2015, DCS removed the Children from Mother's care, after she tested positive on June 17 for amphetamines, diazepam, and heroin. *DCS Exs.* 4, 13, 22. At that time, the Children were placed with their maternal grandmother, although they later were moved to foster care.

[5]	On August 10, 2015, following a fact-finding hearing, the juvenile court adjudicated the Children to be CHINS. *DCS Exs.* 6, 15, 24. The juvenile court found, among other things, that Mother: tested positive in April 2015 for oxycodone; tested positive in June 2015 for amphetamine, 6-acetylmorphine, morphine, and diazepam; was observed with scabs and pick marks on her arms; and admitted to taking morphine without a prescription. *Id.*

[6]	On September 9, 2015, the juvenile court held a dispositional hearing. Mother did not appear in person, but her counsel was present. The juvenile court entered a dispositional order that contained various requirements for parents.

Among other things, Mother was ordered to: (1) contact the family case manager weekly; (2) enroll in all DCS-recommended programs within thirty days; (3) keep all appointments with DCS staff and providers; (4) not use, consume, manufacture, trade, or sell any illegal controlled substances; (5) engage in home-based counseling per the family case manager's recommendation; (6) complete a parenting assessment and a substance abuse assessment, and complete all recommended treatment; and (7) submit to random drug screens. *DCS Exs.* 7, 16, 25. At that time, the Children were still residing with their maternal grandmother.

[7] Mother failed to appear at a December 2015 review hearing, and her whereabouts at that time were unknown. The juvenile court's order found, among other things: Mother had not complied with the Children's case plan; Mother had not cooperated with DCS; Mother inconsistently visited with the Children due to her lack of contact with service providers; and the cause of the Children's out-of-home placement had not been alleviated. *DCS Exs.* 8, 17, 26. It also noted that Mother tested positive for amphetamine and methamphetamine at her last drug screen on October 27, 2015. The court set the matter for a May 2016 permanency hearing.

[8] In January 2016, Mother was charged in the Fayette Circuit Court with dealing in methamphetamine, a Level 5 felony, and visiting a common nuisance, a Class B misdemeanor ("Fayette Case 1"). *DCS Ex.* 29. In March or April 2016, she was arrested for theft in Wayne County and released. *Tr. Vol. II* at 92, 95-96.

[9] In May 2016, a permanency hearing was held in the CHINS proceedings. Mother appeared by counsel, but she did not appear in person. *DCS Exs.* 9, 18, 27. The juvenile court issued an order approving the permanency plan, finding that DCS had provided or offered to Mother substance abuse assessment, home-based case management, and home-based therapy, but that she was not compliant. *Id.* The order determined that Mother: had minimum contact with DCS; had not completed case management or therapy services assessments; appeared under the influence of illegal substances on April 22, 2016 and requested substance abuse services; had been arrested twice for drug-related offenses; and tested positive on December 23, 2015[2] for amphetamine, methamphetamine, opiates, morphine, oxycodone, and oxymorphine. *Id.* The juvenile court approved DCS's permanency plan of adoption. *Id.*

[10] On or around June 17, 2016, Mother was arrested and charged in Fayette County Circuit Court with possession of a narcotic drug, a Level 5 felony; unlawful possession of a syringe, a Level 6 felony; visiting a common nuisance, a Class B misdemeanor; and possession of paraphernalia, a Class C misdemeanor ("Fayette Case 2"). *DCS Ex.* 31; *Tr. Vol. II* at 96.

[11] On June 17, 2016, DCS filed, for each of the Children, a petition to terminate the parental rights of Mother and Father. *Appellant's App. Vol. II* at 35-45. On

---

[2] We note that the Order reflects the date of the drug screen as having occurred on "December 23, 2016," but given that the Order was issued in May 2016, we assume that the screen occurred in December 2015. *DCS Exs.* 9, 18, 27.

August 10, 2016, the juvenile court held an initial hearing; Mother was still incarcerated in the Fayette County jail, but she appeared in person in the custody of the sheriff. The juvenile court appointed a Court Appointed Special Advocate ("CASA") and set the matter for a pretrial hearing in September 2016. Mother, still in custody, appeared at the pretrial hearing, and the court set the matter for fact-finding hearing. *Id*. at 67. On October 7, 2016, Mother entered into a guilty plea on Fayette Case 1, pleading guilty to the lesser-included offense of Possession of Methamphetamine, a Level 6 felony, and she was sentenced to two years imprisonment, with one year suspended to probation. *DCS Ex*. 30.

[12] On October 18, 2016, the CASA, Marilyn Robinson ("CASA Robinson"), submitted a written report ("October 2016 Report") to the juvenile court, informing the court, among other things, that "[t]he grandparents failed to keep the [C]hildren safe by allowing [Mother] and her boyfriend to be with the [Children] unsupervised" and "subsequently, a friend overdosed on drugs with the [Children] in the house." *Appellant's App. Vol. II* at 75. Near that time, the Children were placed with foster parents, but that placement "did not last very long[,]" and the Children were moved on October 27, 2015 to the home of family friends ("Foster Family"). As of the October 2016 Report, the Children had been with Foster Family for approximately one year, and, based on observations and conversations, they were "doing very well" and were "thriving in their current placement." *Id*. at 75-76. Foster Family had expressed interest in adopting the Children and had inquired about resources and assistance that

might be available should they adopt the Children. A1.L., then age 11, told CASA Robinson that she felt disappointed with and did not approve of her parents' lifestyle and did not want to be reunited with them. She also told CASA Robinson that she believed her maternal grandmother and other extended family had substance abuse problems.

[13] On January 17, 2017, the juvenile court held a fact-finding hearing. DCS family case manager Maria Lankford ("FCM Lankford") testified that she became involved in the case in the summer of 2015, around the time of the Children's removal and that, prior to that time, DCS had been involved in "an informal adjustment," during which DCS was addressing the parents' inconsistent and unstable housing. *Tr. Vol. II* at 28, 30. FCM Lankford testified that Mother never complied in any substance use services, had been in and out of incarceration, and "when she was not incarcerated[,] she did not comply with any of the recommendations" that the juvenile court ordered, which included parenting skills, life skills, and substance abuse services. *Id.* at 32. Mother had been referred to various services and never complied. FCM Lankford testified that in April 2016 she saw Mother at a gas station, and Mother expressed that she needed drug treatment and gave FCM Lankford a phone number; FCM Lankford shortly thereafter sent a text message to Mother about starting services at Harbor Lights, and Mother never replied. *Id.* at 61. Mother exercised some supervised visitation with the Children during the proceedings, but "services were later dismissed based on inconsistency." *Id.* at 33. FCM Lankford explained that sometimes supervised visits were arranged

through service providers but parents could not be located due to inconsistent communication between parents and providers. *Id.* at 44. She described that she would have consistent communication with Mother for a period and then "have no contact whatsoever" with her. *Id*. at 45. The maternal grandmother sometimes knew where Mother was staying, but other times did not know where Mother was residing. To locate both parents, FCM Lankford "constantly checked" websites to search for arrests and also used an investigative parent locator service. *Id*. at 46.

[14] FCM Lankford stated that she had concerns about the parents' "off and on incarceration," their use of substances when they were not incarcerated, and their inconsistent and unstable housing. *Id*. at 43. In her opinion, it was in the Children's best interests for DCS to move forward with termination of parental rights. *Id*. She stated that, as is relevant here, Mother did not have a stable history in terms of housing and employment and had not been able to meet the Children's needs. She felt the Children needed stability and consistency. *Id*. at 46-47. The plan for the Children was adoption in their current placement. *Id*. at 43.

[15] FCM Lankford acknowledged on cross-examination that, to her knowledge, Mother had not submitted to any drug screens in 2016 or 2017, but added that she could not obtain a drug screen from Mother if she was "not able to locate [Mother.]" *Id*. at 64. FCM Lankford was asked whether it would affect her opinion about termination to know that Mother had participated in services while incarcerated, and she replied that "the bigger question" was whether the

parent is able to maintain sobriety outside of a structured environment, "and based on the pattern of behavior throughout the case, [the parents] have not been able to do that prior to their incarceration[,] so I would still have concerns of them maintaining sobriety in an unstructured environment." *Id*. at 59.

[16] CASA Robinson testified, stating that she had been the Children's CASA for about six months. She had visited with the Children approximately once a month, and she had had one visit with each parent, who both were incarcerated in the county jail. She expressed concerns about Mother's substance abuse, her repeated incarcerations, and the fact that Mother did not have a stable home. She opined that the Children currently were "in a very loving home" and "in a wonderful, wonderful place now[.]" *Id*. at 69. CASA Robinson was in agreement with DCS in terms of recommending termination of parental rights. *Id*.

[17] Mother testified in her defense. She expected to be released from incarceration in a couple of months, her theft charge was still pending, and she expected to receive probation on that charge. As of the hearing, Mother had been "clean" for seven months, which was the amount of time that she had been incarcerated. *Id*. at 88. She was participating in, and had completed approximately half of, an intensive treatment program at the jail called Therapeutic Community that met daily for approximately five hours a day and was intended to assist participants with decision making and coping skills and handling problems that led to drug use. It also provided treatment for substance abuse and parenting issues. It was the first time Mother had ever received

treatment. She believed that DCS did not really want to help her and that they rushed to file a termination case. She said that upon release from incarceration, she could stay with her brother, who was not a drug user.

[18] On cross-examination, Mother acknowledged that DCS had offered her substance abuse treatment but she did not participate in it, explaining that at the time she had an addiction to opiates and "didn't admit that I had a problem." *Id*. at 95. She tried to quit on her own, but was not successful. She acknowledged the pending Wayne County theft charge and the pending Fayette County Case 2, for possession of heroin, and possession of a syringe and paraphernalia.

[19] On January 17, 2017, the juvenile court entered an order terminating Mother's parental rights to the Children ("Order"). *Appellant's App. Vol. II* at 101. Its findings included that Mother: was provided or offered substance abuse assessment, home-based case management, and home-based therapy but failed to maintain contact with DCS and failed to complete or comply with services; had minimal contact with DCS; had positive drug screens; pled guilty to one drug-related charge and had another pending; and failed to ensure that Children had a permanent and stable residence. *Id*. at 106-07. It concluded that there was a reasonable probability that the conditions which resulted in Children's removal and continued placement outside the home would not be remedied, the continuation of the parent-child relationship posed a threat to the Children, termination of parental rights was in their best interests, and there was a

satisfactory plan for the care and treatment of the Children. *Id*. at 109. Mother now appeals.

## Discussion and Decision

The Fourteenth Amendment to the United States Constitution protects the traditional right of a parent to establish a home and raise her child. *Bester v. Lake Cnty. Office of Family & Children*, 839 N.E.2d 143, 145 (Ind. 2005). Further, we acknowledge that the parent-child relationship is "one of the most valued relationships of our culture." *Id*. However, although parental rights are of a constitutional dimension, the law allows for the termination of those rights when a parent is unable or unwilling to meet her responsibility as a parent. *In re T.F.*, 743 N.E.2d 766, 773 (Ind. Ct. App. 2001), *trans. denied*. Therefore, parental rights are not absolute and must be subordinated to the child's best interests in determining the appropriate disposition of a petition to terminate the parent-child relationship. *Id*. The purpose of terminating parental rights is not to punish the parent but to protect the child. *Id*. Termination of parental rights is proper where the child's emotional and physical development is threatened. *Id*. The juvenile court need not wait until the child is irreversibly harmed such that his physical, mental, and social development is permanently impaired before terminating the parent-child relationship. *Id*. Although the right to raise one's own child should not be terminated solely because there is a better home available for the child, parental rights may be terminated when a parent is unable or unwilling to meet his or her parental responsibilities. *In re J.C.*, 994 N.E.2d 278, 283 (Ind. Ct. App. 2013).

[21]     As our Supreme Court has recently reiterated, "Decisions to terminate parental rights are among the most difficult our trial courts are called upon to make. They are also among the most fact-sensitive—so we review them with great deference to the trial courts[.]" *In re E.M.*, 4 N.E.3d 636, 640 (Ind. 2014). When reviewing a termination of parental rights case, we will not reweigh the evidence or judge the credibility of the witnesses. *In re H.L.*, 915 N.E.2d 145, 149 (Ind. Ct. App. 2009). Instead, we consider only the evidence and reasonable inferences that are most favorable to the judgment. *Id.* Moreover, in deference to the trial court's unique position to assess the evidence, we will set aside the court's judgment terminating a parent-child relationship only if it is clearly erroneous. *Id.* at 148-49.

[22]     Here, in terminating Mother's parental rights to the Children, the juvenile court entered specific findings and conclusions. When a trial court's judgment contains specific findings of fact and conclusions thereon, we apply a two-tiered standard of review. *In re B.J.*, 879 N.E.2d 7, 14 (Ind. Ct. App. 2008), *trans. denied*. First, we determine whether the evidence supports the findings, and second, we determine whether the findings support the judgment. *Id.* A finding is clearly erroneous only when the record contains no facts or inferences drawn therefrom that support it. *Id.* If the evidence and inferences support the trial court's decision, we must affirm. *A.D.S. v. Ind. Dep't of Child Servs.*, 987 N.E.2d 1150, 1156 (Ind. Ct. App. 2013), *trans. denied.*

[23]     Before an involuntary termination of parental rights may occur, the State is required to allege and prove, among other things:

(B) that one (1) of the following is true:

(i) There is a reasonable probability that the conditions that resulted in the child's removal or the reasons for placement outside the home of the parents will not be remedied.

(ii) There is a reasonable probability that the continuation of the parent-child relationship poses a threat to the well-being of the child.

(iii) The child has, on two (2) separate occasions, been adjudicated a child in need of services;

(C) that termination is in the best interests of the child; and

(D) that there is a satisfactory plan for the care and treatment of the child.

Ind. Code § 31-35-2-4(b)(2). The State's burden of proof for establishing these allegations in termination cases "is one of 'clear and convincing evidence.'" *In re H.L.*, 915 N.E.2d at 149. Moreover, if the court finds that the allegations in a petition described in section 4 of this chapter are true, the court *shall* terminate the parent-child relationship. Ind. Code § 31-35-2-8(a) (emphasis added).

[24] Mother argues that DCS failed to prove the required elements for termination by clear and convincing evidence and asserts that the juvenile court's judgment was clearly erroneous. Specifically, she claims that DCS did not prove that (1) the conditions that resulted in the Children being removed or the reasons for their placement outside the home would not be remedied, (2) the continuation of the

parent-child relationship posed a threat to the Children's well-being, and (3) termination was in the Children's best interests.

### *Remediation of Conditions*

Mother admits that she abused drugs for two to three years before being arrested and incarcerated. She acknowledges that during the proceedings she was referred to providers for substance abuse counseling and case management services, but never complied, had little contact with DCS from at least September 2015 to April 2016, and that her drug screens were positive. In or around June 2016, Mother was arrested on drug-related charges and remained incarcerated as of the termination hearing and had other pending charges. Her argument on appeal is that, during her period of incarceration, she had been voluntarily working on improving herself through substance abuse treatment and other jail programs and that, at the time of the termination hearing, she had been sober for seven months. Maintaining that she likely will be released from incarceration in a couple of months, she argues, "Thus, Mother soon would remedy the conditions which prompted the initial removal of the children and justified their continued placement outside Mother's home – that is, her drug abuse and incarceration." *Appellant's Br*. at 14-15. She urges that "whether she could establish a stable life appropriate for her three children will be quickly observable[,]" and "termination of her parental rights "is premature." *Id*. at 10, 21.

In determining whether there is a reasonable probability that the conditions that led to a child's removal and continued placement outside the home would not

be remedied, we engage in a two-step analysis. *K.T.K. v. Ind. Dep't of Child Servs.*, 989 N.E.2d 1225, 1231 (Ind. 2013). First, we must ascertain what conditions led to the child's placement and retention in foster care, and second, we determine whether there is a reasonable probability that those conditions will not be remedied. *Id.* In the second step, the trial court must judge a parent's fitness at the time of the termination proceeding, taking into consideration evidence of changed conditions and balancing a parent's recent improvements against "'habitual pattern[s] of conduct to determine whether there is a substantial probability of future neglect or deprivation.'" *In re E.M.*, 4 N.E.3d at 643 (quoting *K.T.K., 989 N.E.2d at 1231*). Pursuant to this rule, "trial courts have properly considered evidence of a parent's prior criminal history, drug and alcohol abuse, history of neglect, failure to provide support, and lack of adequate housing and employment." *A.F. v. Marion Cnty. Office of Family & Children,* 762 N.E.2d 1244, 1251 (Ind. Ct. App. 2002), *trans. denied.* In addition, DCS need not provide evidence ruling out all possibilities of change; rather, it need establish only that there is a reasonable probability the parent's behavior will not change. *In re Kay L.,* 867 N.E.2d 236, 242 (Ind. Ct. App. 2007). "We entrust that delicate balance to the trial court, which has discretion to weigh a parent's prior history more heavily than efforts made only shortly before termination." *In re E.M.*, 4 N.E.3d at 643. Although trial courts are required to give due regard to changed conditions, this does not preclude them from finding that a parent's past behavior is the best predictor of their future behavior. *Id.* When determining whether the conditions for the removal would

be remedied, the trial court may consider Mother's response to the offers of help. *A.F., 762 N.E.2d at 1252.*

[27] In this case, after the Children were removed from the home, Mother was ordered to stay in contact with DCS, find suitable housing and employment, undergo various assessments, and complete recommended services. That is, DCS referred Mother to home-based counseling to address life skills, housing, employment, parenting time, and parenting skills; Mother never began those home-based services. DCS referred Mother to substance abuse and mental health services, and Mother never began services. She did not stay in contact with DCS, but after encountering Mother in April 2016 at a gas station, where Mother asked for substance abuse help, FCM Lankford contacted Mother, using a current phone number, in an attempt to provide her with information about an in-patient treatment program; Mother never replied.

[28] During the pendency of the CHINS proceeding, mother was incarcerated three times: She was charged with felony dealing in methamphetamine and other charges in January of 2016; she was charged in March or April of 2016 with theft; and in June 2016, she was arrested and charged with felony possession of a narcotic drug, unlawful possession of a syringe, visiting a common nuisance, and possession of paraphernalia. She had been in custody for seven months on the day of the termination fact-finding hearing. While she argues that as of the hearing she had been "clean" for seven months, Mother had been incarcerated during that period of time. *Tr. Vol. II* at 88.

[29] Mother had few visitations with the Children, and there was no evidence presented about past or future employment. As for housing, she lived with her mother and then other friends and relatives when not incarcerated and believed she could live with her brother upon release from incarceration. FCM Lankford and CASA Robinson testified to having continued concerns about Mother's unstable housing, repeated incarcerations, and drug use.

[30] DCS is not required to rule out all possibilities of change, it need only establish that there is a reasonable probability the parent's behavior will not change. *In re Kay L.,* 867 N.E.2d at 242. Also, as we have recognized, "Even assuming that [the parent] will eventually develop into a suitable parent, we must ask how much longer [the child] should have to wait to enjoy the permanency that is essential to her development and overall well-being." *Castro v. State Office of Family & Children,* 842 N.E.2d 367, 375 (Ind. Ct. App. 2006), *trans. denied.* Here, based on the evidence presented, we cannot say that the juvenile court clearly erred in concluding that there is a reasonable probability that the conditions that resulted in the Children's placement outside the home would not be remedied.[3]

---

[3] Mother also suggests DCS failed to prove by clear and convincing evidence that there was a reasonable probability that the continuation of the parent-child relationship posed a threat to the well-being of the Children. We need not address the challenge to the juvenile court's conclusion that the continuation of the parent-child relationship posed a threat to the Children's well-being because Indiana Code section 31-35-2-4(b)(2)(B) is written such that, to properly effectuate the termination of parental rights, the juvenile court need only find that one of the three requirements of subsection (b)(2)(B) has been established by clear and convincing evidence. *A.D.S. v. Ind. Dep't Child Servs.*, 987 N.E.2d 1150, 1156 (Ind. Ct. App. 2013), *trans. denied*.

## Best Interests

[31]     Mother challenges the juvenile court's determination that termination of her parental rights was in the best interests of the Children. In determining what is in the best interests of the child, a trial court is required to look at the totality of the evidence. *In re A.K.*, 924 N.E.2d 212, 224 (Ind. Ct. App. 2010) (citing *In re D.D.,* 804 N.E.2d 258, 267 (Ind. Ct. App. 2004), *trans. denied*), *trans. dismissed.* In doing so, the trial court must subordinate the interests of the parents to those of the child involved. *Id.* Termination of a parent-child relationship is proper where the child's emotional and physical development is threatened. *Id.* (citing *In re R.S.,* 774 N.E.2d 927, 930 (Ind. Ct. App. 2002), *trans. denied*). A parent's historical inability to provide a suitable, stable home environment along with the parent's current inability to do so supports a finding that termination is in the best interest of the child. *In re A.P.* 981 N.E.2d 75, 82 (Ind. Ct. App. 2012). Testimony of the service providers, such as recommendations of the case manager and guardian ad litem, in addition to evidence that the conditions resulting in removal will not be remedied, are sufficient to show by clear and convincing evidence that termination is in the child's best interests. *In re A.S.,* 17 N.E.3d 994, 1005 (Ind. Ct. App. 2014), *trans. denied*.

[32]     The record before us reflects that Mother was addicted to illegal and non-prescribed substances as early as 2012 or 2013. The Children were removed in June 2015, but Mother continued to abuse drugs. Mother was offered substance abuse and other services, but did not participate in them, and she did not stay in contact with DCS. As the juvenile court found, Mother did not take

any steps after the Children were removed to enhance or improve her ability to fulfill her parental obligations; the evidence supports that finding. *Appellant's App. Vol. II* at 105. Mother argues that she should be given more time to show that she has the ability to parent the Children and can provide them with a stable, drug-free home. However, a trial court need not wait until a child is irreversibly harmed such that his or her physical, mental, and social development is permanently impaired before terminating the parent-child relationship. *In re A.K.*, 924 N.E.2d at 224. Additionally, a child's need for permanency is an important consideration in determining the best interests of a child. *Id.* (citing *McBride v. Monroe Cnty. Office of Family & Children,* 798 N.E.2d 185, 203 (Ind. Ct. App. 2003)).

[33] FCM Lankford had concerns about Mother's "off and on incarceration," her use of illegal substances, and her inconsistent and unstable housing. *Tr. Vol. II* at 43. FCM Lankford testified that she felt the Children needed stability and consistency and that, in her opinion, it was in the Children's best interests for DCS to move forward with termination of parental rights. Even though Mother was sober and was participating in an intensive treatment program while incarcerated, FCM Lankford stated that she "still ha[d] concerns of [Mother] maintaining sobriety in an unstructured environment." *Id.* at 59. CASA Robinson testified that the Children currently were "in a very loving home" and "in a wonderful, wonderful place now[.]" *Id.* at 69. She agreed with DCS's recommendation in terms of termination of Mother's parental rights. *Id.* Based upon the totality of the evidence, we conclude that the

evidence supported the juvenile court's determination that termination of Mother's parental rights was in the Children's best interests.

[34] Again, decisions to terminate parental rights "are among the most difficult our trial courts are called upon to make" and are very fact-sensitive. *In re E.M.*, 4 N.E.3d at 640. We will reverse a termination of parental rights only upon a showing of "clear error" – that which leaves us with a definite and firm conviction that a mistake has been made. *In re A.N.J.*, 690 N.E.2d 716, 722 (Ind. Ct. App. 1997). Based on the record before us, we cannot say that the juvenile court's termination of Mother's parental rights to the Children was clearly erroneous. We, therefore, affirm the juvenile court's judgment.

[35] Affirmed.

[36] Bailey, J., and Pyle, J., concur.